## STATE OF CONNECTICUT *v.* ANTONIO RIGUAL
## (AC 16019)

Foti, Landau and Sullivan, Js.

Argued March 23—officially released July 14, 1998

*G. Douglas Nash*, public defender, for the appellant (defendant).

*Frederick W. Fawcett*, assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *C. Robert Satti, Jr.*, assistant state's attorney, for the appellee (state).

*Opinion*

SULLIVAN, J. The defendant, Antonio Rigual, appeals from the judgment of conviction, rendered after a jury trial, of attempted assault of a peace officer in violation of General Statutes §§ 53a-49[1] and

---

[1] General Statutes § 53a-49 provides: "(a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

"(b) Conduct shall not be held to constitute a substantial step under subdivision (2) of subsection (a) of this section unless it is strongly corroborative of the actor's criminal purpose. Without negating the sufficiency of other conduct, the following, if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law: (1) Lying in wait, searching for or following the contemplated victim of the crime; (2) enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission; (3) reconnoitering the place contemplated

53a-167c (a) (1)[2] and the commission of a felony with a firearm in violation of General Statutes § 53-202k.[3] On appeal, the defendant claims that the trial court improperly (1) instructed the jury on self-defense, (2) denied the defendant's motion to require the state to provide a race neutral reason for the exercise of a peremptory challenge to a prospective juror and (3) sentenced the defendant under § 53-202k.

The jury reasonably could have found the following facts. On the afternoon of February 23, 1995, Detectives Richard Donaldson and Robert Martin of the Bridgeport police department were investigating a homicide that occurred the day before. In the course of their investigation, they were informed that Albert Aponte was one

for the commission of the crime; (4) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed; (5) possession of materials to be employed in the commission of the crime, which are specially designed for such unlawful use or which can serve no lawful purpose of the actor under the circumstances; (6) possession, collection or fabrication of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, where such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances; (7) soliciting an innocent agent to engage in conduct constituting an element of the crime.

"(c) When the actor's conduct would otherwise constitute an attempt under subsection (a) of this section, it shall be a defense that he abandoned his effort to commit the crime or otherwise prevented its commission, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose."

[2] General Statutes § 53a-167c (a) provides in relevant part: "A person is guilty of assault of a peace officer . . . when, with intent to prevent a reasonably identifiable peace officer . . . from performing his duty, and while such peace officer . . . is acting in the performance of his duties, (1) he causes physical injury to such peace officer . . . ."

[3] General Statutes § 53-202k provides: "Any person who commits any class A, B or C felony and in the commission of such felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm, as defined in section 53a-3, except an assault weapon, as defined in section 53-202a, shall be imprisoned for a term of five years, which shall not be suspended or reduced and shall be in addition and consecutive to any term of imprisonment imposed for conviction of such felony."

of the persons responsible for the crime. They were searching for Aponte when they saw him on the porch of a house in the Park Terrace area. When Aponte saw Donaldson, Aponte went into the house and closed the door. The two detectives got out of their car, intending to arrest Aponte on outstanding warrants and to question him about the homicide. Martin ran into the house and Donaldson ran to its rear.

Martin looked for Aponte on the second and third floors of the house but did not find him. While in the rear of the house, Donaldson saw the defendant on the second floor porch landing. Donaldson, who was carrying a hand-held police radio, pointed to the radio and said, "Don't move. Police." The defendant ran to the other end of the porch. Donaldson told the defendant, "Stop. Police. Get on the ground, get on the ground." Donaldson then drew his gun, and the defendant went into the house through a window. The defendant then came back onto the porch, through the window and Donaldson told him again, "Get on the ground. Police." The defendant said, "Fuck you," and went back into the house through the window. Donaldson then yelled for Martin and, as he did, heard a shot. When Donaldson looked up, he saw the defendant leaning over the rail and firing at him. Donaldson and the defendant fired shots at each other. Donaldson used his radio to call for assistance.

Martin heard Donaldson yell, "Bob, get back here. Bob, get back here." When Martin reached the rear of the house, he heard shots and saw a male shooting at Donaldson from the second floor. When Martin could no longer see Donaldson or the defendant and when the shooting had stopped, he returned to the front of the house and fired one shot at a person he thought was shooting at Donaldson.

As Donaldson was reloading his weapon, the defendant ran down the porch stairs yelling, "I got you now,

you fucking pig." When the defendant saw that Donaldson had his gun loaded, he ran back up the stairs. Donaldson then fired three more shots and wounded the defendant. At this point, more police officers arrived at the scene.

I

The defendant's first claim is that the trial court improperly charged the jury on self-defense by instructing that if Donaldson was identifiable as a police officer, the defendant "had no right to use any force whatsoever." The defendant asserts that this created a per se exclusion to the defense, which is unsupported by General Statutes § 53a-19[4] or the common law. The

---

[4] General Statutes § 53a-19 provides: "(a) Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm.

"(b) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he is in his dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor, or if he is a peace officer or a private person assisting such peace officer at his direction, and acting pursuant to section 53a-22, or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he abstain from performing an act which he is not obliged to perform.

"(c) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force, or (3) the physical force involved was the product of a combat by agreement not specifically authorized by law."

defendant claims that he was acting in defense of himself and also in defense of the other occupants of the house where the confrontation occurred.

The standard of review to be applied to the defendant's claim is whether it is reasonably possible that the jury was misled by the court's instruction. *State* v. *Ash*, 231 Conn. 484, 493, 651 A.2d 247 (1994); *State* v. *Corchado*, 188 Conn. 653, 661, 453 A.2d 427 (1982). "In determining whether it was indeed reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case." (Internal quotation marks omitted.) *State* v. *Prioleau*, 235 Conn. 274, 284, 664 A.2d 743 (1995).

In its charge to the jury, the court read the relevant parts of the self-defense statute and then stated the following: "Under Connecticut's self-defense statute, a person may justifiably use deadly physical force in self-defense if he reasonably believes both (1) his attacker is using or about to use deadly physical force against him or another, or is inflicting or about to inflict great bodily harm and (2)—they have to find (1)—and (2) that deadly physical force is necessary to repel such attack. The test which you, the jury, must apply in analyzing the second requirement, that the defendant reasonably believed that deadly force as opposed to some lesser degree of force was necessary to repel an alleged attack, is what the courts have referred to as a subjective-objective one. You must view the situation from the perspective of [the defendant], and the law requires that his belief ultimately must be found to have been reasonable. The subjective-objective inquiry into the defendant's belief regarding the necessary degree of force requires that you, the jury, make two separate,

affirmative determinations in order for [the defendant's] claim of self-defense to succeed. You must determine first whether on the basis of all the evidence presented, he in fact did believe that he needed to use deadly physical force as opposed to some lesser degree of force in order to repel the alleged attack by the police. Your initial determination, therefore, requires that you assess the veracity of all witnesses, including [the defendant], and determine whether [the defendant's] account of his belief and the necessity to use deadly force at the time of the confrontation with Detective Donaldson is in fact credible. If you determine that [the defendant] did not believe at the time of the incident that he had needed to employ deadly physical force to repel Detective Donaldson, your inquiry ends and the defendant's self-defense claim must fail. If you determine that [the defendant] in fact did believe that the use of deadly force was necessary to preserve his own life and the lives of others, you must then make a further determination, that is, whether that belief was reasonable from the perspective of a reasonable person in [the defendant's] circumstance.

"Thus, to summarize, if you find that [the defendant] did in fact believe that the use of deadly force in this case was necessary to preserve his own life or the lives of others, and if you also find that his belief was reasonable under the circumstances, then he has prevailed on his self-defense claim and you must find him not guilty of the charges. If, however, you determine that [the defendant] did not believe that the use of deadly force was necessary or that [the defendant's] honest belief that he needed to use deadly force instead of some lesser degree of force was not a reasonable belief, then he is not entitled to the protection of the Connecticut self-defense law.

"*Further, if you are satisfied that [the defendant] reasonably would have identified the officer as a police*

*officer under all those circumstances, then he had no right to use any force whatsoever, but his obligation then was to accede to the request of the police officer."* (Emphasis added.) This sentence is at the heart of the defendant's claim.

The above statement was supplemented, however, by a further charge to the jury on self-defense. "While it is true that an instruction containing a misstatement of the law is more likely to be prejudicial than an instruction that contains an omission or an incomplete statement of the law . . . an incorrect instruction to the jury may be cured by a later correct instruction . . . ." (Internal quotation marks omitted.) *State* v. *Brown,* 35 Conn. App. 699, 707, 647 A.2d 17, cert. denied, 231 Conn. 932, 649 A.2d 254 (1994).

In its recharge on the matter of self-defense, the court stated to the jury: "Now, can he come out and engage in conduct with the person that he did, and can he continue to escalate the defense by returning to the dwelling, obtaining what he did, and coming back out and was then firing a gun at the person in the back-yard. Your determination as to what his knowledge was is most important. Does he have any knowledge in his own mind at that time from the evidence in this case? What do you believe? Did he know that Detective Donaldson was a police officer or did he not know he was a police officer? And you bring to bear upon that all other evidence in the case, including the defendant's testimony that he didn't know, and that Officer Donaldson did not tell him get down or sit down, but that he merely fired bullets at him and said other things, which didn't allow this man to conclude they were not acting as police officers.

"Now, these are things for you to determine, and they bear on the defense of self-defense. If he had no knowledge that he was under an attack by unknown

persons coming to assaultive behavior on the dwelling that he was located in, then he is entitled to the defense of self-defense if everything [is] in accordance with his principles, but he doesn't have to prove that. The state has to disprove by satisfying you beyond all reasonable doubt that [the defendant], beyond a reasonable doubt, did not believe at the time of the incident that he needed to employ deadly physical force to repel Detective Donaldson. If you believe that he did not believe that beyond a reasonable doubt, then your inquiry ends and the defendant's self-defense claim must fail."

The jury then deliberated all of Friday. On Monday, the court again recharged the jury on self-defense. The trial judge advised the jury that he was giving a supplemental charge on the defense of self-defense to clarify what he had previously stated. As part of that supplemental instruction, the court charged the jury as follows: "It may be concluded from the statute that a man who is being assaulted or who reasonably believes that he is about to be assaulted may use force in such a degree as he reasonably believes is necessary for his defense. The moment he steps over the line and uses more force than he reasonably believes is necessary, then he becomes a wrongdoer and he becomes guilty of the crime itself. The test is not what force is actually necessary to protect himself from the use or imminent use of force. Rather, the test is what force did he, acting as a reasonable man, believe to be necessary under the circumstances.

"Now, 'reasonably' means what an ordinary prudent man, a man of ordinary mental and physical capacity, using his faculties in a normal manner, might do or perceive in a given set of circumstances, a man of common sense acting in a common sense manner. A reasonable belief is a belief generated by the particular circumstances fairly created and honestly entertained.

"Now, in determining what the defendant reasonably believed, you should ask whether an ordinary prudent man, a man of ordinary mental and physical capacity using his faculties in a normal manner, might do or perceive. What would a man of common sense acting in common sense do under the circumstances that you find the defendant found himself in?

"The statute focuses on the person claiming self-defense. What would a man in the position of a defendant reasonably believe under the circumstances? You must view the—view the situation from the perspective of the defendant and, ultimately, you must find that the defendant's belief was reasonable under the circumstances."

In analyzing the defendant's claim on appeal, "we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury." (Internal quotation marks omitted.) *State* v. *Lemoine*, 233 Conn. 502, 509, 659 A.2d 1194 (1995). "The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result. . . . While the instructions need not be exhaustive, perfect or technically accurate, they must be correct in law, adapted to the issues and sufficient for the guidance of the jury." (Internal quotation marks omitted.) *State* v. *Rodriguez*, 47 Conn. App. 91, 95, 702 A.2d 906 (1997), cert. denied, 243 Conn. 960, 705 A.2d 552 (1998). Here, the charge accurately stated the law, was adapted to the issues and facts of the case, and was sufficient to guide the jury.

II

The defendant's second claim is that the trial court improperly denied his request that the state provide a race neutral explanation for the exercise of a peremptory challenge to a prospective juror. In the voir dire

process, Domingos Baia was questioned as a prospective juror by both the state and the defendant. During voir dire, Baia stated that he had been arrested six months previously by a Bridgeport police officer for driving under the influence. The court asked Baia, "Are you Hispanic?" Baia responded, "Portuguese." At the end of the voir dire questioning the defendant accepted Baia as a juror. The state exercised a peremptory challenge to excuse him. The defendant objected to the dismissal and stated that it was time for the state to reveal its reason for excusing Baia. After a discussion on the record with both counsel, the court stated: "They [the state] have a reason. They just haven't been required to state it. And the way we are here, I can't make them do that at this juncture." The state never revealed its reason for excusing Baia.[5]

The seminal case addressing juror discrimination claims is *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). "*Batson* delineates the process by which claims of discriminatory peremptory challenges are to be adjudicated. The defendant carries the ultimate burden of persuading the trial court, by a preponderance of the evidence, that the jury selection process in his or her particular case was tainted by purposeful discrimination. Id., 94 n.18. As in other litigation involving allegations of racial discrimination, the adjudication of claims of discrimination in the selection of the petit jury normally proceeds through two stages. A defendant who is a member of a cognizable racial

---

[5] "[Defense Counsel]: I'm not questioning that. It is much too heavy a burden to raise, given that situation. All I'm saying, when somebody like this comes up, it is a member of a minority, the state should have to be required to state a reason.

"The Court: You have no response, is that it?

"[Assistant State's Attorney]: If you want me to give a response. At this point, I don't believe he has reached the threshold to have me give a response.

"The Court: Yeah. Not under the present form of the law . . . ."

group must first establish a prima facie case of purposeful discrimination. Id., 96–97. Once that threshold has been crossed, the burden of production shifts to the state to advance a neutral explanation for its peremptory challenges of jurors of the defendant's race. Id., 97. At this juncture, the defendant has an opportunity to show that the articulated reasons are insufficient or merely pretextual. 'Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility'; id., 98 n.21; a trial court's determination that there has or has not been intentional discrimination is 'entitled to appropriate deference' upon review on appeal. Id." *State* v. *Gonzalez*, 206 Conn. 391, 395, 538 A.2d 210 (1988).

In Connecticut, a *Batson* hearing is appropriate whenever "[1] the defendant requests such a hearing; [2] the defendant is a member of a cognizable racial group; and [3] the prosecutor exercises peremptory challenges to remove members of [the] defendant's race from the venire." (Internal quotation marks omitted.) *State* v. *Holloway*, 209 Conn. 636, 646 n.4, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989). An Hispanic is a member of a racially cognizable group. *State* v. *Gonzalez*, supra, 206 Conn. 396. The defendant, who is Hispanic, claims that he and Baia were members of the same cognizable racial group. When the trial court asked Baia if he was Hispanic, Baia answered that he was Portuguese. In this matter, there is no evidence that persons of Hispanic and Portuguese descent are from the same cognizable racial group. The defendant's mere assertion that he is of the same racially cognizable group as Baia is not sufficient. Therefore, this court will not address whether the state had a valid race neutral reason for excusing Baia, since the defendant has not reached the threshold set out in either *Batson* v. *Kentucky*, supra, 476 U.S. 79, or *State* v. *Holloway*, supra, 636.

## III

Finally, the defendant asks this court to vacate his conviction under § 53-202k because that statute constitutes a sentence enhancement provision for crimes committed with a firearm and does not constitute a separate substantive offense.

This issue is controlled by *State* v. *Dash*, 242 Conn. 143, 698 A.2d 297 (1997). "[Section] 53-202k is a sentence enhancement provision and not a separate crime. Consequently, although the defendant's total effective sentence of sixteen years was proper, the judgment must be modified to reflect the fact that § 53-202k does not constitute a separate offense. Accordingly, the defendant is entitled to have his conviction under § 53-202k vacated." Id., 150.

The judgment is reversed only as to the separate conviction under General Statutes § 53-202k and the case is remanded with direction to render judgment resentencing the defendant to a total effective term of fifteen years imprisonment, execution suspended after thirteen years, with five years probation.

In this opinion the other judges concurred.